**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-60973-CIV-ALTMAN/Reid**

**STEVEN DOUGLAS SHERMAN**,

     *Plaintiff,*

v.

**SERGEANT QUEST,** *et al.*,

     *Defendants.*

_____/

**<u>ORDER</u>**

Before the Hon. Roy K. Altman:

Steven Sherman says that, without any provocation, five Broward Sheriff's Office Deputies (the "Officers") entered his cell and beat him up. But that beating is only part of his story. According to Sherman, after he was beaten, Ronald Henri ("Henri")—the nurse who treated his broken ribs—was deliberately indifferent to his medical needs. And, to add insult to injury, when Sherman filed a grievance against the Officers, Sergeant Andre Quest, Jr. ("Quest") retaliated against him by moving him for two weeks to a windowless cell. After protracted litigation—during which this case has been reviewed by two separate magistrates and two different district judges— the Defendants[1] moved for summary judgment. This Order follows.

**PROCEDURAL HISTORY**

In his Second Amended Complaint (the "SAC"), Sherman levies two causes of action. *First*, he says that "his well established right to be free from being subjected to cruel[] and unusual punishment as proscribed by the 8th or 14th Amendment to the US Constitution was violated when the Defendants listed in his Statement of Facts knowingly and intentionally severely beat Plaintiff,

---

[1] "The Defendants" are the five Officers—including Quest—and Nurse Henri.

and acted in concert with one another to prevent him from receiving any medical treatment for the injuries the Defendants inflicted upon Plaintiff." SAC [ECF No. 13] at 14. *Second*, he alleges that his "well established right to seek redress of government via grievance process absent any form of reprisal was violated when the Defendants mentioned in the Statement of Facts did retaliate against him for filing grievances against them for beating him. This retaliation violates the 1st Amendment to the US Constitution." *Id*.

The Honorable Ursula Ungaro—to whom this case was initially assigned—referred the SAC under 28 U.S.C. § 1915(e) to then-Magistrate Judge Patrick A. White for a Report and Recommendation. *See* Clerk's Notice of Assignment [ECF No. 2]. After review, Judge White recommended that the following claims should proceed beyond § 1915 screening: the excessive-force and failure-to-intervene claims against the Officers in their individual capacities (Counts 1–2, 4–11); a First Amendment retaliation claim against Quest in his individual capacity (Count 3); and a deliberate-indifference claim against Henri in his individual capacity (Count 12). *See* First Report [ECF No. 18].[2]

Magistrate Judge White also recommended that this Court dismiss the remaining claims, including: a claim of deliberate indifference against "Mr. Nash" (a healthcare company executive) in his individual capacity (Count 13); "the claim of deliberate indifference against Sergeant Quest in his individual capacity" (Count 14); "the claim of deliberate indifference against all other defendants in their individual capacities" (Count 15); "the due process claims against Sheriff

---

[2] This case has seen four such Reports and Recommendations: the first, as mentioned, screened the SAC, *see* First Report [ECF No. 18]; the second addressed the Plaintiff's Motion to Amend, *see* Second Report [ECF No. 47]; the third dealt with the Defendants' Motion to Dismiss, *see* Third Report [ECF No. 149]; and the fourth assessed the parties' motions for summary judgment, *see* Fourth Report [ECF No. 153]. To keep things simple, unless otherwise specified, any references in this Order to "the Report" are to the Fourth Report.

Israel, in his individual capacity and official capacity" (Count 16); "the due process claims against all other individual defendants in their individual or official capacities" (Count 17); "all claims against the defendants in their official capacities" (Count 18); "the motions for temporary or preliminary injunctive relief" (Count 19); and "the motion for declaratory relief" (Count 20). *Id.* When neither party objected, Judge Ungaro "affirmed" the First Report without further analysis. *See* Order Affirming First Report [ECF No. 20].

The Officers and Henri moved separately for summary judgment. *See* Officers' Motion for Summary Judgment ("Officers' MSJ") [ECF No. 117]; Henri's Motion for Summary Judgment ("Henri MSJ") [ECF No. 114]. This Court referred those motions to Magistrate Judge Lisette M. Reid, who recommended: (1) granting Henri's MSJ on Sherman's deliberate-indifference claim; (2) granting the Officers' MSJ on Sherman's First Amendment claim; (3) denying the Officers' MSJ on Sherman's excessive-force claim; and (4) allowing Sherman's failure-to-intervene claim—as to which the Officers did not move for judgment—to proceed to trial. *See* Fourth Report at 31.

Both Sherman and the Officers objected to certain portions of the Report's recommendations. *See* Plaintiff's Objections [ECF No. 154]; Officers' Objections [ECF No. 155].

## STANDARD OF REVIEW

When a magistrate judge's "disposition" has been properly objected to, district courts must review that disposition *de novo*. FED. R. CIV. P. 72(b)(3). But, when no party has timely objected, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." FED. R. CIV. P. 72 advisory committee's notes (citation omitted). Although Rule 72 itself is silent on the standard of review, the Supreme Court has acknowledged that Congress's intent was to require *de novo* review only where objections have been properly filed—and not when neither party objects. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does

not appear that Congress intended to require district court review of a magistrate [judge]'s factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."). "A party filing objections must specifically identify those findings objected to and the specific basis for such objections." *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 2005 WL 8155948, at *1 (S.D. Fla. Sept. 21, 2005). Therefore, the "[f]ailure to object to the magistrate [judge]'s factual findings after notice precludes a later attack on these findings." *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988) (citing *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. 1982)).

## THE FACTS

In 2018, Sherman was a pre-trial detainee at the Broward County Main Jail (the "Main Jail"). *See* Officers' Statement of Undisputed Material Facts ("Officers' SOF") [ECF No. 117-2] ¶ 2. On March 8, 2018, as Sherman was walking by another inmate's cell, that inmate called Sherman a "fucking cracker" and struck Sherman in the torso with a pungent admixture of urine and feces. *See* Sherman Deposition Transcript ("Sherman Dep.") [ECF No. 114-3] at 30:1–4; *see also id.* at 47:9–10 ("I had feces all over my pants and my shirt . . . ."). In response, Sherman "retaliated." In his words: "I just—I pulled my pants down and I—there's a crack in the door that's about less than two inches, and I actually urinated into his cell after that." *Id.* at 30:11–14; *see also* Plaintiff's Declaration in Opposition to Officer's MSJ ("Pl. SOF") [ECF No. 123] at 3, ¶ 3 ("I Steven Sherman retailed [sic] by urinating through the crack of his door into his cell."). Sherman then "showered off" and returned (shirtless) to his cell. *Id.* ("I wasn't wearing a shirt at all since it had urine and feces on it from the time I left the shower and the whole time of the incident.").

A correctional officer—not a defendant in this lawsuit—who had seen Sherman's retaliation (but who had missed the other inmate's instigation) placed Sherman into "lockdown."

Sherman Dep. at 33:18–20 ("Q: And he placed you in lock down because of what he observed? A: Yes, Sir."); Pl. SOF at 3, ¶ 3 ("Deputy Payer told me to lockdown.").

Hearing what happened, Quest summoned four other deputies—together, the five Officer-Defendants here—to discuss the incident and to "conduct a shakedown of Plaintiff's cell." Sergeant Andre Quest Affidavit ("Quest Aff.") [ECF No. 117-1] ¶ 6. Quest told the deputies that Sherman "threw urine in another inmate's cell, and that we would now search his cell for any contraband that could be used to throw urine such as altered plastic bottles and plastic bags." Deputy Randy Maynes Affidavit ("Maynes Aff.") [ECF No. 117-1] ¶ 6. After some preparation and briefing, the five Officers—including Quest—entered Sherman's cell. *See* Deputy Christian Anda Affidavit ("Anda Aff.") [ECF No. 117-1] ¶ 7; Sherman Dep. at 37. At least one Officer has attested that, when he entered the cell, Quest told Sherman "we were going to conduct a shakedown of his cell and that [Sherman] should move away from his bunk and allow us to handcuff him." Anda Aff. ¶ 7.

Here, the parties' stories diverge. Sherman alleges that Quest ordered his deputies to "Get his ass!!!"—a command Sherman characterizes as an attack signal. Pl. SOF at 3, ¶ 5. Hearing this directive, Sherman says, "[Officers] Maynes and Anda were the first to start physically abusing me." Sherman Dep. at 37:24–25. And, he continued: "They must have hit me, you know, my body, my face at least 20 or 30 times, and then they were able to drag me off my bed, you know, by my feet onto the ground, which then I had rolled over and was on my hands and knees, and they were just punching, kicking you know. I think they hit me with the walkie-talkie. And this went on for like a minute. I would say I took at least 100 blows to the back—the back of the head, the back." *Id.* at 38:2–10.  Not willing to stand idly by, "the other Defendants[,] Sgt. Quest, Deputy Morancy, and Deputy Dieuvelhomme[,] dragged me off my bed and onto the floor where they all participated

in kicking[,] stomping[,] and punching me in my head face and back, breaking my ribs, swelling my face in different spots of my eyes and forehead and jaw. There was [sic] also abrasions on my back where I was beat [sic] while I was on my hands and knees." Sherman SOF at 4, ¶ 8. While Quest says that, during the struggle, he instructed Sherman to "comply and stop resisting"—and warned him that, "if he continued to resist that I would use my taser," *see* Quest Aff. ¶¶ 14–15— Sherman insists that "[h]e [Quest] never said stop resisting," Sherman Dep. at 45:14.

The Officers, to be fair, tell a different story. In their version, the "Plaintiff immediately took off his shirt, got into an aggressive fighting stance with fists balled up, and stated 'I got full blown aids, let's fucking go bro!'" Anda Aff. ¶ 8; *see also* Quest Aff. ¶ 7; Maynes Aff. ¶ 8; A. Morancy Affdavit ("Morancy Aff.") [ECF No. 117-1] ¶ 8; James Dieuvelhomme Affidavit ("Dieuvelhomme Aff.") [ECF No. 117-1] ¶ 8. According to the Officers, Quest tried to calm Sherman by "telling him that we mean no harm," and "that we wanted to prevent another incident like that from happening again," but Sherman "ignored Sergeant Quest and then lunged with both arms at Deputy Maynes' facial area." Dieuvelhomme Aff. ¶¶ 9–10.

Sherman denies threatening the Officers in this way. In his telling, "I had never said anything about having AIDS, wanting to fight them." Sherman Dep. at 47:19–20. Nor does Sherman admit to removing his shirt when the Officers first entered, noting that "I wasn't wearing a shirt at all since it had urine and feces on it from the time I left the shower and the whole time of the incident." Pl. SOF at 3, ¶ 3. The Court is not in a position, at this stage of the case, to opine on which version of the facts is true. Instead, this Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In any case, the Officers admit to beating Sherman, *see* Officers' MSJ at 1—though, in their telling, the beating was both shorter and less violent, *see id.* at 2. According to the Officers, after Sherman lunged at Deputy Maynes, Maynes began "striking Plaintiff with closed fists several times in [Sherman's] facial area." Diuevelhomme Aff. ¶ 11. Deputy Morancy, by his own admission, "assisted by striking Plaintiff in his abdomen and side areas and then pulled him to the ground to gain control." Morancy Aff. ¶ 13; *see also* Diuevelhomme Aff. ¶ 13 ("Deputy Morancy continued to use pain compliance on Plaintiff by striking his abdominal area."). Once Sherman was on the ground, "Deputy Maynes tried to control him by grabbing [Sherman's] flailing arms so he could apply handcuffs." Quest Aff. ¶ 13.

Ultimately, Sherman "let Deputy Maynes place handcuffs on him." Diuevelhomme Aff. ¶ 15. The parties agree that, after Sherman was handcuffed, no further force was applied. *See* Quest Aff. ¶ 17 ("After being handcuffed, no more force was applied to Plaintiff."); Sherman Dep. at 41:04–08 ("Q: Okay. But insofar as the more direct question that I asked you the beating stopped once you were handcuffed, and you were immediately led out to greet Nurse Henry [sic], correct? A: Yes.").

With Sherman now handcuffed, Deputies Morancy and Maynes walked him from his cell through the dayroom and out to the hallway where Henri was waiting. *See* Sherman Dep. at 115:2–4 ("And when I was—was entered through the dayroom out to the hallway, Nurse Henry [sic] was there waiting for me to come downstairs."); *id.* at 117:1–2 ("I was brought out, and Nurse Henry [sic] was out there waiting for me."); Maynes Aff. ¶ 22 ("[Deputy Morancy and I] then escorted Plaintiff out of his cell to be medically assessed by Nurse Henri."). Once there, Henri checked Sherman's vital signs (all normal), asked him questions, and inspected Sherman's injuries. *See* Henri Aff. ¶ 6. Because Sherman had a cut above his eyebrow, Henri "wip[ed] it off with the saline

solution, and then he put some neosporin on it[.]" Sherman Dep. at 118:24–25; *see also* Henri Aff. ¶ 7 ("Mr. Sherman had a small cut above his left eyebrow with blood coming from it and a bump on his forehead on the right side. Pursuant to protocols, I cleaned Mr. Sherman up and cleaned the blood off of him which came from the cut above his eyebrow. I completed wound care and determined that the cut did not need stitches. I used an ointment on the cut which blocked the bleeding."). Sherman avers that "I told [Henri] about my—the pain about my ribs." Sherman Dep. at 150:4. Sherman told Henri that "I can't see straight and my face and jaw was [sic] in a lot of pain and my ribs are broken and they hurt very badly from any type of movement. I felt my ribs move inward as they don't usually move and my face would not stop bleeding." Pl. SOF at 4, ¶ 10.

Henri wrote a medical report, which noted "a small cut on left eyebrow and a small bump on the right side of forehead." Urgent Medical Care Record [ECF No. 114-3] at 200. Based on his evaluation, Henri "determined that Mr. Sherman did not need x-rays nor emergency observation by a doctor." Henri Aff. ¶ 8. In Sherman's cell, Deputies Maynes and Anda photographed Sherman's injuries. *See* Pl. SOF at 4, ¶ 11.

About an hour later, Henri followed up with Sherman. *See* Sherman Dep. at 127. Henri gave him "some Motrin and an ice pack," *id*. 127:9, as well as "some bandages," *id*. at 127:13–14. Henri advised Sherman that, "if he feels worse in the day, or during the week, or if the pain continues, [he] can write a sick call request to see a doctor." Henri Aff. ¶ 10. Henri did not see Sherman again after March 8, 2018. *See id*. ¶ 13 ("I did not see Mr. Sherman again after March 8, 2018 in regards to these injuries.").

The next day, March 9, 2018, Sherman, still in pain, asked a nurse for medical attention and was advised to fill out a "sick call" form—a form requesting medical treatment—which Sherman submitted "at the evening time of the 9th." Sherman Dep. at 135:23–24.

On March 10, 2018, Sherman was transferred from a windowed to a windowless cell, where he remained for about two weeks. *See* Pl. SOF at 6, ¶ 17. On March 11, Sherman was approved for X-rays. [3] *See* Sick Call Request [ECF No. 114-3] at 203. On March 14, a "sick call" nurse saw Sherman,[4] and an Advanced Registered Nurse Practitioner ("ARNP") treated him the following day. *See* Pl. SOF at 5, ¶ 12

On March 16, Sherman had x-rays taken of his jaw, skull, and ribs. *See* Radiological Consultation [ECF No. 114-3] at 206–08; Sherman Dep. At 141–42. While his jaw and skull x-rays were negative, the rib x-ray indicated "nondisplaced fractures involving the topography of approximately the 9th and 10th left ribs." Radiological Consultation at 208. Sherman thus alleges that he suffered "permanent injuries such as the scar on his forehead, and frequent very severe head aches which cause Plaintiffs [sic] vision to actually blur, and the Plaintiff experiences severe

---

[3] It's undisputed that Sherman was approved for x-rays on March 11. What is contested is whether a nurse came to see Sherman that day. The Sick Call Request indicates that, on that day, a nurse came and took his temperature, his pulse, his blood pressure, and his respiration rate. *See* Sick Call Request at 203. This accords with Sherman's progress notes, which reflect that a nurse saw him at 11:45 a.m. on March 11. *See* Progress Notes [ECF No. 124] at 47. But, in both his deposition and his Objections, Sherman denied receiving treatment on that day. *See* Sherman Dep. at 147 ("[T]his is a manipulated document [referring to the Sick Call Request] that was manipulated a month or two after the incident."); Pl. Obj. at 5 ("No treatment till the March 15, 2018 by a ARNP that got the referral X-rays and treatment . . . ."). Again, at this stage, the Court must accept Sherman's sworn testimony as true.

[4] Sherman's Objections conflict with his Statement of Facts as to whether he received treatment on the 14th. *Compare* Pl. SOF at 5, ¶ 12 ("To my memory I was seen by a male sick call nurse in the evening on March 14, 2018 . . . . ") *with* Pl. Obj. at 5 ("No treatment till the March 15, 2018 by a [sic] ARNP[.]").

psychological damage, because he now has frequent mild to severe anxiety/panic attacks." SAC at 11.

After the incident, Sherman filed four grievances against the Officers.[5] Pl. SOF at 5, ¶ 13; Response to Henri MSJ at 23, 30, 51. The Officers, for their part, filed a disciplinary report. That report was then forwarded to the Disciplinary Committee, which found Sherman guilty of "conduct which disrupts," "assault or battery," and "failure to follow sanitation." Disciplinary Committee Action Sheet [ECF No. 114-3] at 209. As punishment, the Disciplinary Committee gave him 30 days of lockdown. *Id.*

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking

---

[5] He filed these grievances on March 9, April 2, April 7, and April 10.

10

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington*, 261 F.3d at 1265.

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

When, as here, the plaintiff is proceeding *pro se*, the Court must interpret his pleadings liberally because *pro se* pleadings are held to "less stringent standards than those drafted by an attorney." *Sause v. Bauer*, 138 S. Ct. 2561, 2563 (2018). At the same time, the Court may not "serve as de facto counsel or [] rewrite an otherwise deficient pleading in order to sustain an action." *Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 716 n.3 (11th Cir. 2011).

## ANALYSIS

### I.      Excessive Force

Sherman alleges that the Officers used excessive force when they "knowingly and intentionally severely beat" him. SAC at 14. In their MSJ, the Officers advance four arguments: *first*, they say that Sherman failed to exhaust his administrative remedies, *see* Officers' MSJ at 5; *second*, they argue that the doctrine laid out in *Heck v. Humphrey* bars Sherman's complaint, *see id.* at 4; *third*, they contend that there remains no genuine issue of material fact as to whether they deployed excessive force, *id.* at 8; and *fourth*, they insist that they're entitled to qualified immunity, *id*.

On these questions, the Report concluded as follows: (1) that the Officers had waived their exhaustion defense, *see* Fourth Report at 9; (2) that *Heck v. Humphrey* was inapplicable, *see id.* at 11; (3) that there were genuine issues of material fact, *id.* at 21; and (4) that the Officers had never raised the defense of qualified immunity, *id.* at 13. In their Objections, the Officers challenge only the first, third, and fourth conclusions. *See* Officers' Obj. at 1, 2, and 4. The Court thus reviews those aspects of the Report *de novo*—and the rest for clear error. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Civ. P. 72 advisory committee's notes.

## A.      Failure to Exhaust

Because Sherman is an inmate, he's subject to the Prison Litigation Reform Act's ("PLRA") exhaustion requirement. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). To exhaust these "administrative remedies," a prisoner must comply with his prison's grievance procedures. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) ("Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to properly exhaust." (internal quotations omitted)). The PLRA thus requires that prisoners "properly take each step within the administrative process," including, if the initial grievance is denied, by filing "a timely appeal." *Bryant v. Rich*, 530 F.3d 1368, 1378 (11th Cir. 2008).

As relevant here, the Main Jail's grievance procedures require prisoners to include in their grievances, among other things, "the names of other individuals involved," Officers' MSJ at 7–8 (quoting Broward Sheriff's Office Department of Detention, Standard Operating Procedures 7.7D). But, notwithstanding this Main Jail requirement, the Eleventh Circuit has held that a prisoner need only "identify all who are known to have injured him and to provide as much relevant information as reasonably possible in [his] administrative grievances." *Brown v. Sikes*, 212 F.3d 1205, 1208 n.3 (11th Cir. 2000).[6]

---

[66]      Since "proper exhaustion" under the PLRA means "compliance with an agency's deadlines and other critical procedural rules," *Geter v. Baldwin State Prison*, 974 F.3d 1348, 1355 (11th Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)), one might suppose that Sherman's failure to name all five Officers—as required by the Main Jail's procedures—is fatal to his claim. But "a prisoner need not name any particular defendant in a grievance in order to properly exhaust his claim." *Parzyck v. Prison Health Servs. Inc.*, 627 F.3d 1215, 1218 (11th Cir. 2010); *Brown*, 212 F.3d at 1207 ("While § 1997e(a) requires that a prisoner provide as much relevant information as he reasonably can in the administrative grievance process, it does not require he do more than that."). And this makes sense. After all, "Section 1997e(a)'s exhaustion requirement is designed

Two of the five Officers (Dieuvelhomme and Morancy) moved to dismiss Sherman's SAC on the ground that he had failed to exhaust his administrative remedies. *See* Officers' Motion to Dismiss [ECF No. 74]. Specifically, Officers Dieuvelhomme and Morancy argued that Sherman's SAC should be dismissed because he had failed to name them in his administrative grievance to the Main Jail. *See id*. at 4 ("The specific unexhausted available administrative remedy in the instant case involves Plaintiff's failure to identify the names of the individuals involved."). This Court denied that aspect of the Officers' motion because "it is not unreasonable to assume that, at the time he filed his grievance, Sherman did not actually know the correct names of the deputies who had allegedly attacked him." Order Denying Motion to Dismiss [ECF No. 150] at 3.

---

'to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued.'" *Parzyck*, 627 F.3d at 1219 (quoting *Jones*, 549 U.S. at 219). The Eleventh Circuit, in other words, recognizes that, sometimes, "[t]he best you can do is the best you can do." *Brown*, 212 F.3d at 1210.

Here, both sides agree that Sherman (timely) filed a grievance against five Broward Sheriff's Office Deputies for engaging in the very same conduct he later attributed to them in his complaint. *See* Fourth Report at 24–25. In that grievance, Sherman included the right time and date of the incident and expressly listed the number of officers involved and the specific behavior he objected to. *Id.* The Defendants do not dispute that Sherman only became aware of the names of the five officers who (he says) assaulted him through discovery. *See* Motion for Leave to File Amended Complaint [ECF No. 39] at 2 ("The Plaintiff was misinformed by staff members on the identity and names of Defendants in verbal conversations on who the regular Thursday night officers are and who actually worked the Thursday night 3–11 p.m. shift on 3-8-18."). And it's undisputed that, once he learned those names, Sherman promptly moved to amend his complaint to substitute Deputy Morancy for Deputy Powell and Deputy Diuevelhomme for Deputy Greene. *See id*; *see also* Defendants' Motion for Clarification [ECF No. 46] (asking the Court to dismiss the two deputies who were mistakenly named in the original complaint as a result of their absence from the amended complaint). This Court granted that motion and allowed the SAC to be interlineated—all without objection from the Defendants. *See* Second Report at 2; *see also* Order "Affirming" Second Report [ECF No. 52] at 2 (dismissing Deputies Powell and Greene). Because the Officers never suggest that Sherman knew (or even that he could have known) the Officers' correct names sooner, they seem to agree that *this* was the very "best [Sherman] can do" in the circumstances. Their argument that Sherman failed to comply with the Main Jail's procedures is thus unavailing.

Now, in their MSJ, the same two Officers[7] contend that Sherman failed to exhaust his administrative remedies because (1) "he had failed to appeal the disciplinary committee's findings against him," and (2) he failed "to name Deputy Morancy and Deputy Dieuvelhomme" in his grievance. Officers' MSJ at 7–8. The Fourth Report concluded that the Officers had waived the first of these arguments by failing to raise it in their Motion to Dismiss. *See* Report at 9–11.

The Officers advance two objections to this finding—both unpersuasive.

*First*, they submit that "waiver occurs when a party wholly fails to raise the argument"—and not, as here, when a party's failure is *partial*. *See* Officers' Obj. at 2. The Defendants, of course, cite not a single case in which *any* court has endorsed this fanciful (and illogical) whole-versus-partial-waiver distinction. Nor has the Court found one. This is unsurprising. After all, the Officers' position only begs the next question: Did the Officers partially (or wholly) fail to raise the argument they make here? And, even a cursory glance at their Motion to Dismiss—and the Court's order—reveals the answer: They *wholly* failed. That motion never addressed the Main Jail's appellate process, never discussed whether Sherman appealed the denial of his grievances under that process, and never suggested that any such failure to appeal should result in dismissal. And, because the motion never advanced these concerns, the Court never analyzed them. The argument, in short, was *wholly* waived.

Of course, one might suppose that, at some level of generality, these two Officers did *partially* make the argument they raise now by having suggested that Sherman's SAC should be dismissed for failure to exhaust his administrative remedies. Using that logic, though, there's

---

[7] The Fourth Report also found that the remaining three Officers had waived any exhaustion argument they might have had. *See* Fourth Report at 9. And the Officers did not objection to this conclusion. *See generally* Officers' Obj. Having reviewed this aspect of the Report for clear error, the Court now affirms it on this issue (as to these three Officers).

nothing to stop a defendant at summary judgment from insisting that, by virtue of having filed a motion to dismiss for failure to state a claim, he had advanced every conceivable 12(b)(6) argument—both those he had made in his motion to dismiss and those he had left out. After all, just as one might (using the Officers' logic) *partially* preserve *any* failure-to-exhaust argument by having advanced an entirely different failure-to-exhaust position in the motion to dismiss, one might *partially* preserve any failure-to-state-a-claim contention by having raised a different failure-to-state-a-claim position in the motion to dismiss—and so on. This, fortunately, isn't the law. A party preserves an argument by advancing *that argument*. *See, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *cf. United States v. Joseph*, 730 F.3d 336, 340 (3d Cir. 2013) ("[Is] raising an issue in a suppression motion or hearing sufficient to preserve any argument within that issue? Our decisions in *Lockett, Rose,* and *Tracey* show that it is not."); *United States v. Maez*, 960 F.3d 949, 959 (5th Cir. 2020) ("A motion under Rule 29 that makes specific arguments waives issues not presented, but a general motion preserves every objection.").

The Federal Rules enshrine this commonsense approach. So, for example, to promote the Court's and the parties' joint interests in efficiency and finality, Rule 12(g)(2) requires defendants to raise *any* non-jurisdictional Rule 12 arguments in their *first* Rule 12 motion. *See* FED. R. CIV. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."); *see also Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("The policy behind Rule 12(g) is to prevent piecemeal litigation in which a defendant moves to dismiss on one ground, loses, then files a second motion on another ground."). And a plaintiff's failure to exhaust his administrative remedies is unquestionably non-jurisdictional. *See Santiago-Lugo v. Warden*, 785 F.3d 467, 472 (11th Cir. 2015) ("Examples of non-jurisdictional rules . . . include claim-

processing rules, such as exhaustion requirements, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." (cleaned up)). For this reason, "[e]xhaustion of administrative remedies . . . should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Bryant*, 530 F.3d at 1374–75 (cleaned up). In other words, "a defendant must raise the exhaustion defense in his first Rule 12 motion, otherwise the defense is forfeited and cannot be raised in a later motion under Rule 12." *Brooks v. Warden*, 706 F. App'x 965, 968 (11th Cir. 2017); *id.* at 970 ("And as a non-jurisdictional claim-processing rule, the exhaustion defense is subject to forfeiture under Rule 12(g)(2)."). Allowing defendants to re-raise, at every inflection point, these ever-evolving permutations of a failure-to-exhaust motion would facilitate—rather than discourage—piecemeal litigation and eviscerate Rule 12's interest in finality. The Defendants' whole-versus-partial-waiver argument is thus unavailing.

*Second*, the two Officers ask this Court to excuse their waiver because, when they filed this MSJ, they had not yet received the Court's ruling on their Motion to Dismiss. Officers' Obj. at 2. But, again, "a defendant must raise the exhaustion defense in his first Rule 12 motion, otherwise the defense is forfeited and cannot be raised in a later motion under Rule 12." *Brooks*, 706 F. App'x at 968. Neither Rule 12 nor the cases applying it create any exception to this hard-and-fast rule in the not-uncommon scenario presented here—i.e., where the motion for summary judgment is filed *before* the court has ruled on the motion to dismiss. Nor would any such exception make sense—at least not in the circumstances of this case. After all, Rule 12(g)(2)'s forfeiture provision is triggered when a defendant fails to raise an argument in his first motion to dismiss. Since the unraised argument is waived as of *that* filing, nothing that happens later can revive it. There is certainly no reason to believe that subsequent procedural nuances—like, for instance, the sudden

arrival of a summary-judgment deadline—can have any effect on the defendant's already-forfeited contentions. And the Defendants never explain why they would.

The Report, in sum, correctly found that the Defendants had waived their first exhaustion argument.

The Court has already rejected the Defendants' second exhaustion argument—that Sherman's failure to name Officers Dieuvelhomme and Morancy in his administrative grievance is fatal to his claim. *See* Order Denying Motion to Dismiss at 3. The Court will not revisit that decision here, except to note (again) that the Eleventh Circuit has not required prisoners "to name each defendant in a grievance in order to properly exhaust a claim[.]" Third Report at 4 (citing *Williams v. Barrow*, 559 F. App'x 979, 986 (11th Cir. 2014)). Instead, a prisoner need only "identify all who are known to have injured him and to provide as much relevant information as reasonably possible[.]" *Id*. (citing *Brown*, 212 F.3d at 1208 n.3). And Sherman asserted in his previous filings (under penalty of perjury) that "he became aware of the actual names of the Defendants *only after the grievance process*." *Id*. at 5 (emphasis added). The Officers did not challenge this assertion in their Motion to Dismiss, and the Third Report correctly found that Sherman had satisfied the Eleventh Circuit's requirements by supplying the information he had at the time. *See id*. at 6; *see also* Order Denying Motion to Dismiss at 3. The Officers (notably) did not object to this conclusion when it appeared in the Third Report, *see* Docket (showing that no objections were filed in response to the Third Report), so their belated objection here is (very) untimely. In any event, because the Third Report's determination on this issue was not clearly erroneous, the Court reaffirms it here.

The Defendants' exhaustion Objections are therefore **OVERRULED**.

**B.**      ***Heck v. Humphrey***

The Report determined that the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), did not bar review of Sherman's claims, *see* Report at 12, and the Officers do not challenge this conclusion, *see generally* Officers' Obj. Because this finding was not clearly erroneous, the Court adopts it here.

*Heck* bars claims only when it "is a logical necessity that judgment for the plaintiff in that suit would contradict the existing punishment." *Dixon v Hodges*, 887 F.3d 1235, 1238 (11th Cir. 2018). And, while the Disciplinary Committee did find Sherman guilty of "conduct that disrupts," "assault or battery," and "failure to follow sanitation," *see* Disciplinary Committee Action Sheet [ECF No. 114-3] at 209, the Report concluded that "success on Plaintiff's claim does not necessarily contradict the disciplinary findings, as it is logically possible that force was necessary to restrain Plaintiff, but the amount of force actually used was excessive," Report at 12. This is exactly right. The Disciplinary Committee was concerned only with Sherman's conduct. It thus did not have to consider the question presented here: whether—even if Sherman needed to be restrained—the *quantum of force* the Officers deployed to secure him was excessive. The Report, in short, did not clearly err in concluding that *Heck* is inapplicable here.

### C.      Excessive Force

Until 2015, "[a] claim of excessive force under the Fourteenth Amendment [was] analyzed as if it were an excessive-force claim under the Eighth Amendment." *Patel v. Lanier Cty.*, 2020 WL 4591270, at *4 (11th Cir. Aug. 11, 2020) (internal citations omitted). According to that (old) rule, the "use of force against a pretrial detainee [was] excessive under the Fourteenth Amendment if it shocked the conscience" or was "applied maliciously and sadistically to cause harm." *Id.* (cleaned up). But, in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court clarified that the Eighth Amendment's malicious-intent requirement "does not extend to pretrial detainees."

*Patel,* 2020 WL 4591270, at *4 (citing *Kingsley*, 576 U.S. at 396). Instead, the Court held that a pretrial detainee's Fourteenth Amendment excessive-force claim should be governed by a rule of "objective reasonableness." *Kingsley* at 396–97; *see also id.* ("[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."). In sum, "the Fourteenth Amendment standard has come to resemble the test that governs excessive-force claims brought by arrestees under the Fourth Amendment." *Patel*, 2020 WL 4591270, at *4 (citing *Piazza v. Jefferson Cty.*, 923 F.3d 947, 952–53 (11th Cir. 2019)).

     Applying these principles, this Court must *first* evaluate whether Sherman has shown that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97. If he has, then the Court proceeds to the *second* step: determining whether "the use of that amount of force in those circumstances was constitutionally excessive," *Simmons v. Bradshaw*, 879 F.3d 1157, 1166 (11th Cir. 2018)—which is to say, "excessive" in light of "clearly established" law. As the Eleventh Circuit has explained:

> It makes perfect sense to conclude, as the Supreme Court did in *Saucier*, that with such claims the merits issue and the qualified immunity issue are distinct, so that the existence of a valid Fourth Amendment excessive force claim is not inconsistent with qualified immunity. In other words, a defendant officer could use force in making an arrest that is later judged to be excessive enough that it violates the Fourth Amendment, but if prior decisions did not clearly establish that the use of that amount of force in those circumstances was constitutionally excessive, the defendant officer would be entitled to qualified immunity.

*Id.*

     To determine whether the force the officers used was excessive (the first prong), a court must decide "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (cleaned up). This standard is not "mechanical": "A court must make this determination from the perspective of a reasonable officer on the scene, including

20

what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at

397. In doing so, courts must consider the "legitimate interests that stem from the government's

need to manage the facility in which the individual is detained, appropriately deferring to policies

and practices that in the judgment of jail officials are needed to preserve internal order and

discipline and to maintain institutional security." *Id*. (cleaned up).

     In answering this first question (excessiveness), the Supreme Court has directed courts to

consider—among other potential factors—"the relationship between the need for the use of force

and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to

temper or to limit the amount of force; the severity of the security problem at issue; the threat

reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*[8]

---

[8]    A not-so-quick aside to explain why we're using the *Kingsley*—rather than the *Graham*—factors. *Graham* is, of course, the seminal Supreme Court case on the test lower courts should use when assessing the "objective reasonableness" of an officer's conduct towards an *arrestee*. *See Graham*, 490 U.S. at 396 ("Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."). And, because the Fourth Amendment governs in the context of arrestees, the *Graham* factors are animated by that Amendment's reasonableness standard. *Id.* at 395 ("Today we make explicit what was implicit in *Garner*'s analysis, and hold that *all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

    But, until *Kingsley*, courts were split on the question of which test should apply in the case of an officer who (allegedly) used excessive force against a *pretrial detainee*. *Compare Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005) ("[I]t makes no difference whether Haggard was a pretrial detainee or a convicted prisoner because the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving pretrial detainees.") (cleaned up) (abrogated by *Kingsley*, 576 U.S. 389) *with Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir. 1990) ("We may assume that although Titran had not been placed in a cell by the time of the events in question, her presence in the jail and the completion of the booking marked the line between 'arrest' and 'detention.' [sic] It does not follow that officers acquired greater ability to assault and batter Titran. . . . Most of the time the propriety of using force on a person in custody pending trial will track the Fourth Amendment . . . ."). Before *Kingsley*, in other words, a federal court

Assuming, as this Court must, that Sherman's allegations are true, the *Kingsley* factors support his claim that the Officers used excessive force against him.

*First*, on "the relationship between the need for the use of force and the amount of force used," *id.*, the Eleventh Circuit has been pellucid that *some* minimal force is almost always permissible, *see Rodriguez v. Farrell*, 280 F.3d 1341, 1351–52 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."). But, by his telling, Sherman was subjected to far more than "minimal" force. According to his sworn testimony—which, again, this Court must accept as true—Sherman was bashed with a walkie-talkie and then punched, kicked, or otherwise hit between "20 or 30" and

---

addressing this issue had to choose between two options: (1) the Fourth Amendment's "objective reasonableness" standard; or (2) the Eighth Amendment's proscription against "cruel and unusual punishment." In *Kingsley*, the Supreme Court clarified that courts should apply the former to pretrial detainees—like Sherman—because "pretrial detainees (unlike convicted prisoners) cannot be punished at all." 576 U.S. at 400. And so, while the *Kingsley* and *Graham* factors answer the same question—whether the quantum of force was "objectively reasonable"—they approach it in different ways. Recognizing these differences, and for the following two reasons, this Court will apply the *Kingsley* factors here.

*First*, *Graham* is purposefully not exhaustive. *See Graham*, 490 U.S. at 396 ("Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . ."). Indeed, the *Graham* Court acknowledged that its list would not map on perfectly to every situation—leaving open the possibility that future courts would outline additional (or alternate) factors that (might) better fit the facts of subsequent cases. And, as the Supreme Court suggested, the *Kingsley* factors simply fit better in cases (like ours) that involve the rights of pretrial detainees. For one thing, the *Kingsley* factors explicitly include the jail's compelling interest in operating a safe (and secure) correctional institution—a consideration that's (notably) absent from *Graham*. For another, the *Graham* factors place special emphasis on whether the arrestee is attempting to evade arrest—a consideration that, in most (if not all) cases, will be irrelevant in the context of a jail.

*Second*, despite citing to *Graham*, the *Kingsley* Court *nevertheless* changed the list of available factors—adding some and dropping others—to better suit the correctional setting. *See Kingsley*, 576 U.S. at 397 ("Considerations such as the following may bear on the reasonableness or unreasonableness of the force used . . . . *See, e.g.*, *Graham, supra*, at 396, 109 S.Ct. 1865. We do not consider this list to be exclusive. We mention these factors only to illustrate the types of objective circumstances potentially relevant to a determination of excessive force."). In deciding which factors to apply here, in short, this Court takes its guidance from *Kingsley*.

"100 times." Sherman Dep. at 38. However many times he was hit, it was substantially more than the kinds of *de minimus* "painful handcuffing" or "pushing against the wall" that the Eleventh Circuit has found reasonable in the context of incarcerated detainees. *Cf. Rodriguez*, 280 F.3d at 1351–52; *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560 ("Once Lirio was handcuffed and taken outside, no further force was needed. But, even though pushing Lirio against the wall might have been unnecessary, this pushing was not plainly unlawful.") *as amended*, 14 F.3d 583 (11th Cir. 1994).

And, of course, the first *Kingsley* factor requires the Court to balance the use of force against "the need for the use of force." 576 U.S. at 397. If Sherman's testimony is to be believed, there was no "need" for the Officers' force because he (at all times) fully complied with their commands. *See* Sherman Dep. at 87 ("You, know, I actually had complied with all of their – you know, everything that they had said."). This first factor, then, weighs in Sherman's favor.

*Second*, we must assess the extent of Sherman's injury. *See Kingsley*, 576 U.S. at 397. On this factor, while the absence of serious injury is not fatal to an excessive-force claim, *see Hudson v. McMillian*, 503 U.S. 1, 4 (1992) ("This case requires us to decide whether the use of excessive physical force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury. We answer that question in the affirmative."), "the extent of injury may also provide some indication of the amount of force applied," *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). In his SAC, Sherman alleges that he sustained severe injuries: a concussion, broken ribs, a gash to his head, and "permanent [sic] injuries, such as the scar on his forhead [sic] and frequent very severe headaches which cause Plaintiffs [sic] vision to actually blur, and the Plaintiff experiences severe psychological damage, because he now has frequent mild to severe anxiety/panic attacks." SAC at 11. And, at summary judgment, Sherman submitted competent

23

evidence that he suffered "nondisplaced fractures" to his "9th and 10th left ribs," Radiological Consultation [ECF No. 114-3] at 206–08, and a cut on his forehead, *see* Broward Sheriff's Office Urgent Medical Care Record [ECF No. 114-3] at 201. Sherman admittedly adduced no evidence of his other (claimed) injuries, and—he admitted—he has no medical training with which to render any meaningful self-diagnosis. *See* Sherman Dep. at 99–100. Either way, though, the cut forehead and the two fractured ribs strongly suggest that the quantum of force was not insubstantial. This second factor, in short, likewise tilts in Sherman's favor.

*Third*, the Court should consider "any effort made by the officer to temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397. Here, again, Sherman says that the Officers beat him with a walkie-talkie and kicked and punched him as many as 100 times—all *for no reason*. Pl. SOF at 3, ¶ 5. If this is true, it hardly reflects an effort at temperance. In this respect, the Defendants make much of Sherman's admission that, as soon as he was handcuffed, the Officers stopped beating him. *See* Officers' MSJ at 11 (citing Sherman Dep. at 41:04–08 ("Q: Okay. But insofar as the more direct question that I asked you, the beating stopped once you were handcuffed, and you were immediately led out to greet Nurse Henry [sic], correct? A: Yes.")). But this cherry-picked snippet only begs the salient question: Did the Officers "temper" or "limit" their use of force *before* Sherman was handcuffed? And, if we're to accept Sherman's account, the answer to this (dispositive) question is *no*. The third factor thus militates in Sherman's favor.

*Fourth*, this Court should assess "the severity of the security problem at issue." *Kingsley*, 576 U.S. at 397. Security problems can include anything from "quell[ing] a prison riot," *Whitley v. Albers*, 475 U.S. 312, 314 (1986), to "transfer[ing] [an inmate] to another part of the jail," *Johnson v. Conway*, 688 F. App'x 700, 708 (11th Cir. 2017), or, as relevant here, searching for contraband, *see Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328

(2012) ("[C]orrectional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities.").

Sherman doesn't dispute that the Officers entered his cell in search of "any contraband that could be used to throw urine such as plastic bottles and plastic bags." Maynes Aff. ¶ 6. Sherman, in fact, admits that an officer saw him urinate into another inmate's cell. *See* Pl. SOF at 3, ¶¶ 3–4. It's not this Court's role to second-guess the Officers on the kinds of in-house problems that could easily escalate into acute security scenarios. *See Piazza*, 923 F.3d at 953 ("And of course, officers facing disturbances are often forced to make split-second judgments about the need for such force in circumstances that are tense, uncertain, and rapidly evolving. Because of this, we can't (and won't) evaluate a pretrial detainee's excessive-force challenge in a glib, post-hoc fashion or with the 20/20 vision of hindsight." (cleaned up)); *see also Kingsley*, 576 U.S. at 397 ("A court must also account for the legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security" (cleaned up)). And it's not unreasonable to suppose that one inmate's decision to urinate into another's cell—a cell that, in a real way, has become that second inmate's home—is precisely the kind of jailhouse situation that, if left unaddressed, could quickly spiral out of control. This Court, in sum, agrees with the Officers that their contraband search was in response to a (potentially) "sever[e] . . . security problem," *Kingsley*, 576 U.S. at 397. This fourth factor accordingly favors the Officers.

*Fifth*, the Court must evaluate "the threat reasonably perceived by the officer." *Kingsley*, 576 U.S. at 397. In so doing, though, the Court is strictly limited to analyzing the threat the officers reasonably perceived according to *the plaintiff's* version of the facts. *See Skelly v. Okaloosa*

*County Bd. of Cty. Cmmr's*, 456 F. App'x 845, 848 (11th Cir. 2012) ("[U]nder her version, when the force was applied, Skelly was handcuffed, compliant, and in a secure area of the jail. Skelly had done nothing to cause a disturbance or indicate that she presented a threat to security or order."). Here, Sherman insists that the Officers were under no threat at all. The pertinent portion of his deposition went like this:

> Q:     Okay. And can you tell me which – which of the deputies that – that actually punched you?
>
> A:     Okay. When they first entered my cell, they all – they told me sit down on my bunk. I sat down on my bunk –
>
> Q:     And just to interrupt, you were not handcuffed at that point, correct?
>
> A:     No. I was not handcuffed.
>
> Q:     Sorry to interrupt you.
>
> A:     They told me to sit up on my bunk. I sat up on my bunk towards facing out to the door, towards my left, Deputy Maynes was standing to my left, and behind him was Deputy Moranski. Towards my right was Officer Anda, and then behind him was Duvalone [sic], and then in the middle, right in front of me was Sergeant Quest. And at that point, who initiated the, you know, I would say the, you know was – Maynes and Anda were the first to start physically abusing me.
>
> Q:     Okay.
>
> A:     At that point, I was sitting on my bed. They must have hit me, you know, my body, my face at least 20 or 30 times, and then they were able to drag me off my bed, you know, by my feet onto the ground, which then I had rolled over and was on my hands and knees, and they were just punching, kicking, you know. I think they hit me with the walkie-talkie. And this went on for like a minute. I would say I took at least 100 blows to the back – the back of the head, the back.

Sherman Dep. at 37–38.

At this point in the story, then, the Officers—who entered Sherman's room to deal with a sanitation issue, *id.* at 33—outnumbered Sherman five to one, *id.* at 38. When they directed him onto his bed, he complied and sat down. *Id.* There is (notably) no evidence that Sherman might

26

have had a weapon—or even a history of violence. *See generally* Officers' MSJ. On Sherman's version of the facts, in other words, the Officers were not reasonably threatened. This fifth factor thus weighs in Sherman's favor.

*Sixth,* we must consider whether Sherman was "actively resisting." *Kingsley*, 576 U.S. at 397. Here, courts look to whether the plaintiff had a history of resistance, whether he was actively resisting when he was subdued, and whether he could have continued to resist after he was secured. *See, e.g.*, *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) ("[The officer] would have been placing himself at risk had he called off the canine before ensuring that Crenshaw was fully secured. This is true regardless of whether Crenshaw was actively resisting arrest at that point, as [the officer] had no reason to trust that Crenshaw would not suddenly attempt to do him harm."); *Pierre v. Padgett*, 808 F. App'x 838, 845 (11th Cir. 2020) ("Accordingly, the district court did not clearly err in finding that, before he was pepper-sprayed, Plaintiff had continued to actively resist even while he was on the ground."). At the same time, "[w]hen jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive." *Piazza*, 923 F.3d at 956. Again, Sherman is adamant that he complied with the Officers' every command, that he never resisted, and that he gave no indication of resisting in the future. Sherman Dep. at 87 ("You know, I actually had complied with all of their – you know, everything that they had said."). Indeed, he testified that he was so compliant that the topic of resistance never even came up. As he explained at his deposition:

Q:      Urging you to stop resisting?

A:      No. He never said stop resisting.

Q:      What did he say?

A:    I was never – they – when they came into my room, they never said anything about resisting. They were just beating – you know, they were physically abusing me. I mean, I was on the ground. After they were done abusing me, you know, when the punches stopped flying, that's when they cuffed me up and brought me downstairs.

*Id*. at 45. The sixth factor, then, likewise weighs in Sherman's favor.

Taking Sherman's account as true, then, five of the six *Kingsley* factors support his claim that the Officers deployed excessive force against him.[9] Based (mostly) on this, the Report concluded that Sherman had adequately identified a genuine issue of material fact on this question. *See* Report at 20.

To this conclusion, the Officers direct two objections—both unavailing.

*First*, the Officers contend that a video-recording of the incident flatly contradicts Sherman's account. *See* Officers' Obj. at 2–3. But, despite having watched the video *at least* ten times, the Court cannot discern much about what happened in Sherman's cell. *See* Notice of Conventional Filing Under Seal [ECF No. 116]. The video shows the five Officers entering Sherman's cell—with one remaining by the door, swaying from side to side. *See id.* If one squints hard enough, one might be justified in supposing that the video shows one human kicking another human one time, *see id.*—though the salient questions of who kicked whom and why are far beyond the scope of the video. And, while the Officers ultimately extracted Sherman from his cell

---

[9] Sherman's story comes from two sources: his verified complaint and his sworn deposition testimony. Taken together, these submissions are—so long as they rely on admissible evidence—sufficient to withstand summary judgment. *See Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) ("Sears' statements in his verified complaint, sworn response to the officers' motion for summary judgment, and sworn affidavit attached to that response should have been treated as testimony by the district court."). This makes sense. Rule 56(c), after all, allows "a nonmoving party to dispute a material fact through an affidavit, which must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *United States v. Stein*, 881 F.3d 853, 856–57 (11th Cir. 2018) (en banc). And "most of our cases correctly explain that a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *Id.*

and led him to the medical ward, "two of the Defendant Officers lowered Plaintiff's head just as Plaintiff was approaching the surveillance camera. By lowering Plaintiff's face just as he would have come into focus, the Defendant Officers cannot rely on it to show the extent of Plaintiff's facial injuries immediately after the incident." Report at 20. The video is thus wholly ambivalent and generally supports neither side. Indeed, if anything, the video *could* lend credence to Sherman's account for two reasons: *one*, it's just long enough—about two-and-a-half minutes— for five Officers to land 20 to 30 blows; and *two*, it plainly shows one person kicking another— just as Sherman avers.

The Officers' *second* objection—that, if their side of the story is true, then the force they used was objectively reasonable, *see* Officers' Obj. at 3—misses the point. The Officers may be entirely right when they say that, after yelling that he had AIDS, Sherman precipitated the skirmish by "lung[ing] at Deputy Maynes." *Id*. at 4. At summary judgment, though, this Court cannot resolve credibility determinations or weigh competing claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Again, Sherman denies that he did any of these things and insists that, throughout his encounter with the Officers, he remained docile and compliant. If that's true—and the Court is not suggesting for a moment that it is—a reasonable jury *could* find that the quantum of force the Officers deployed was unreasonable.[10]

---

[10]     The Officers attached to their MSJ what they characterize—it is almost illegible—as a notarized affidavit in which Sherman admitted that his claims against Quest were false. *See* Witness Statement [ECF No. 114-3] at 199. Sherman disavowed this affidavit and made clear that

Because Sherman's version of the facts raises a genuine issue as to whether the Officers deployed excessive force, the Defendants' Objections to this aspect of the Report are **OVERRULED**.

### D.      Qualified Immunity

Of course, this finding—that Sherman has successfully advanced a jury question as to the degree of force the Officers deployed—would be irrelevant if the Officers could establish that they're entitled to qualified immunity.

"Qualified immunity protects government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 (11th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In this way, the defense of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To qualify for the immunity, a government official must show that the challenged actions were committed within the scope of

---

"Sgt. Quest said he was going to 'stomp [me] to death' and deploy his taser on [me]." Response to Officers' MSJ at 16. Correctly noting that "credibility determinations are not appropriate on summary judgment," the Magistrate Judge refused to consider the affidavit. Report at 20. The Defendants (wisely) do not object to this decision, *see generally* Officers' Obj.—and, seeing no clear error in it, the Court now adopts the Magistrate Judge's determination.

While we're on the topic, the Officers (and Henri) also submitted two unsworn expert reports: one from a nursing consultant on the applicable standard of care and a second from a retired police officer on the use of force. *See generally* Pearson Report [ECF No. 114-4]; Rodriguez Report [ECF No. 114-2] at 3. The Magistrate Judge declined to consider either report because "generally, unsworn expert opinions should not be considered on summary judgment." Report at 16–18 n.4. Again, the Defendants do not object to this decision, *see generally* Officers' Obj.—and, seeing no clear error in it, the Court now adopts it.

his discretionary authority. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). If he can do so, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To overcome the qualified-immunity defense, a plaintiff must show that the official deprived him of a constitutional right that was "clearly established" at the time of the alleged offense. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This requirement "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206. For purposes of qualified immunity in this District, only decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the Supreme Court of Florida constitute "clearly established" law. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

In some circumstances, however, where "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," the official is not entitled to the defense of qualified immunity. *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). This is because "[t]he easiest cases don't even arise." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (citation omitted). "There has never been," for instance, "a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages." *Id.* (citation omitted). To meet this exception to the "clearly established law" requirement—or, put another way, to show that the unconstitutionality of the official's conduct was "readily apparent"—a plaintiff must demonstrate that the official's conduct "was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point." *Mattox*, 127 F.3d at 1419. But, as the Eleventh Circuit has made clear, this exception applies only where

"every reasonable officer in [the official's] position [would] conclude the force was unlawful." *Post*, 7 F.3d at 1559.

### 1.    Discretionary Function

The Report concluded that the Officers had "failed to adequately invoke qualified immunity" because they had not demonstrated how their conduct fell within the scope of their discretionary functions. Report at 23. Instead, the Report found, the Officers "simply conclude[d] that 'it is clear that [they] were performing discretionary duties when the incident occurred.'" *Id*. (quoting Officers' MSJ at 13). In objecting, the Officers refer the Court to the affidavits they submitted in conjunction with their MSJ, in which the Officers made clear that "they were performing a contraband search of Plaintiff's cell after learning he urinated in a fellow inmate's cell . . . . Conducting a contraband search in an inmate's cell is a discretionary function." Officers' Obj. at 5. Whether the Officers properly invoked the doctrine of qualified immunity is a question this Court reviews *de novo*.

While the Report is correct that "a bald assertion by the defendant that the complained-of actions were . . . within the scope of his discretionary authority is insufficient," *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018), "a government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority," *id*. (citing *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). In determining the scope of an officer's discretionary authority, "we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Mikko v. City of Atlanta,* 857 F.3d 1136, 1144 (11th

Cir. 2017).[11] And, in evaluating whether an act was within the officer's discretionary function, courts ask whether the act falls within the officer's general job duties. *See Hollomon ex rel. Hollomon v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) ("Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities."). In this respect, "[o]ur inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id.*

Sherman does not deny that a jail-stationed officer's "legitimate job-related function" includes the power to search an inmate's cell. *See generally* Response to Officers' MSJ. Nor could he. Just as a police officer's general job duties include the power to effectuate an arrest, a jail deputy's job responsibilities necessarily include the power to search an inmate's cell for contraband. *See, e.g.*, *Moton v. Walker*, 545 F. App'x 856, 859 (11th Cir. 2013) ("Officers routinely conducted searches of inmates' cells and those searches sometimes included strip searches and visual body cavity inspections."). The Officers, in fact, made this point in their MSJ—though, admittedly, with a concision that leaves something to be desired. *See* Officers' MSJ at 13 ("In this case, it is clear that Defendants were performing their discretionary duties when the incident occurred."). They also attached to their MSJ certain affidavits, in which they attested that they entered Sherman's cell to conduct a contraband search. *See* Quest Aff. ¶¶ 4–5; Maynes Aff. ¶¶ 5–6; Anda Aff. ¶¶ 4–5. That's more than enough in the circumstances. Because this Court agrees with the Officers that their search of Sherman's cell fell squarely within the ambit of their

---

[11] In this step of the analysis, therefore, we must ignore Sherman's assertion that the search was pretextual, *see* Pl. SOF at 8, ¶ 2 ("[The Officers were] looking for contraband including bottles and bags knowing that I did not have this was only to justify having a reason to enter my cell."), because, on this question, the search's constitutionality is irrelevant.

discretionary functions,[12] the Officers are entitled to qualified immunity *unless* Sherman can show that they deprived him of a constitutional right that was "clearly established" on the day of the incident.

### 2. Clearly Established Law

"Once the public official has established that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity does not apply." *Artiga v. Garcia*, 316 F. App'x 847, 848 (11th Cir. 2008). Having established that the Officers have met their burden of showing they were acting within their discretionary authority, the burden now shifts to Sherman to show that the Officers' actions violated some clearly established law.

"It bears repeating that generally no bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity." *Priester*, 208 F.3d at 926; *see also Johnson*, 688 F. App'x at 709 ("No 'materially similar case' declares the detention officers' conduct unconstitutional, and the broad principles of law on which Johnson relies do not apply with 'obvious clarity' to the specific situation facing the detention officers."). There is, to be sure, a "narrow exception" to this rule for those rare cases in which "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw . . . ." *Priester*, 208 F.3d at 926. But, under "both the general rule and its narrow exception, . . . pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what

---

[12] On this issue, then, the Court rejects the Report's recommendation.

defendant is doing violates federal law in the circumstances for qualified immunity to be unavailable to a defendant." *Id.* at 927 (cleaned up).

This standard is a heavy one. But, even were it otherwise, Sherman would fail to satisfy it because *he never even mentions or addresses it*. *See generally* Response to Officers' MSJ; Pl. Obj. As the Officers (correctly) point out, Sherman "did not challenge or respond to Defendants' qualified immunity argument" *at all*. Officers' Obj. at 6. Sherman, in fact, never even mentions qualified immunity. He certainly never cites any case that might have put the Officers on notice about the unconstitutionality of their conduct. Nor can he contend that the Officers failed to put him on notice of their intent to rely on a qualified-immunity defense. After all, they dedicated five of their nineteen-page MSJ to the subject. *See* Officers' MSJ at 13–17. In those five pages, the Officers argued that they were entitled to qualified immunity, *see id.* at 13; that they had not violated Sherman's rights by deploying excessive force against him, *see id.* at 14–15; and that, even if they had, Sherman could point to no "clearly established" law that would have apprised them of the unconstitutionality of their conduct, *see id.* at 15–17. Because Sherman never mentions—let alone rebuts—any of these contentions, he has (arguably) waived any argument he might have had on qualified immunity. *See, e.g.*, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

*Pro se* pleadings are, to be sure, held to "less stringent standards than those drafted by an attorney." *Sause*, 138 S. Ct. at 2563. At the same time, the Court may not "serve as de facto counsel or [] rewrite an otherwise deficient pleading in order to sustain an action." *Shuler v. Ingram & Assocs.*, 441 F. App'x 712, 716 n.3 (11th Cir. 2011). "Being *pro se* does not, by itself, excuse a failure to raise an argument," *Ramirez v. Sec'y, United States Dep't of Transp.*, 686 F.3d 1239, 1250 (11th Cir. 2012)—especially where, as here, the *pro se* petitioner has advanced *some* arguments, but not others. Sherman, for instance, cited *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), for the proposition that all genuine disputes of material fact must be construed in his favor, *see* Response to Officers' MSJ at 14—a proposition that, as we've seen, has redounded to his benefit. As we will see—q.v. our below discussion on the First Amendment—Sherman also (correctly) refers to *Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005), for the standard that governs First Amendment retaliation claims. *See* Response to Officers' MSJ at 15. Sherman's Response, then, strongly suggests that he has *strategically* responded to certain arguments. While "[p]*ro se* parties are afforded some leniency with respect to the procedural rules of litigation, [] a party (whether pro se or represented by counsel) cannot survive a motion to dismiss by strategically failing to respond to arguments put forth by an opponent." *Thomas v U.S. Bank Nat'l Assoc.*, 2015 WL 11236542, at *1 (N.D. Ga. Sept. 24, 2015).

The Court will not "act as [Sherman's] de facto counsel," *Franks v. State Bd. of Pardons and Paroles*, 210 F. App'x 860, 860 (11th Cir. 2006)—especially on a question, like this one, on which he indisputably bears the burden, *see Lee*, 284 F.3d at 1194 (noting that, once the officers establish that their actions fall within their discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate"). The Officers' Objections to this part of the Report are, therefore, **SUSTAINED**, and this aspect of the Report is **VACATED**.

Recognizing, however, that the Plaintiff is *pro* se, the Court will afford him one *final* opportunity to advance an argument *on this question only*.[13] For more details on this aspect of the Court's ruling, see *infra*, pp. 56–57.

## II.     Failure to Intervene

In a footnote, the Report observed that the Defendants had not moved for summary judgment on Sherman's failure-to-intervene claims and recommended that those claims proceed to trial. *See* Report at 23 n.8. In their Objections, the Defendants correctly note that (1) the SAC contains no such failure-to-intervene claims, and (2) no such claims can be inferred from the SAC because "allegedly [all of the Defendants] participated in the attack." Officers' Obj. at 6–8.

To allege a failure-to-intervene claim under § 1983, "[t]he law of this circuit is that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (internal quotation marks omitted). But even a cursory glance at the SAC reveals that he asserted no such failure-to-intervene cause of action. *See generally* SAC. Nor does the SAC ever allege (*see, e.g.*, SAC at 14) that one of the Officers was "present at the scene and . . . fail[ed] to take reasonable steps to protect" him, *Velazquez*, 484 F.3d

---

[13] The Federal Rules appear to contemplate just such a result. A court, after all, may not enter summary judgment by default "even if there is a complete failure to respond to the motion . . . ." FED. R. CIV. P. 56 advisory committee's notes. And, by entering summary judgment against Sherman *because of* his failure to answer the Defendants' qualified-immunity arguments, the Court would be (in effect) entering a species of default judgment against him. *Cf. Sims v. Leonard*, 465 F. App'x 869, 871 (11th Cir. 2012) ("[T]o state that a party's claim 'necessarily' fails because that party has 'failed to respond' to a dispositive motion results in the imposition of a default judgment."). In fact, the Advisory Committee's Notes to Rule 56 contemplate a situation (like ours) in which a *pro se* plaintiff has failed to respond to a portion of a dispositive motion. In such cases, the Committee explained: "Many courts take extra care with pro se litigants, advising them of the need to respond and the risk of losing by summary judgment if an adequate response is not filed." FED. R. CIV P. 56 advisory committee's notes.

at 1341. To the contrary, Sherman repeatedly avers—both in his SAC and in his sworn testimony—that *all five* Officers actively beat him. *See* SAC at 8 ("Defendants Deputy R. Maynes and C. Anda initiated the beating . . . then the other Defendants joined in on the beating."); Sherman Dep. at 39:2–3 ("All five of them had put their hands on me."). This Court may not "rewrite an otherwise deficient pleading in order to sustain an action." *Shuler*, 441 F. App'x at 716 n.3.

Of course, before the Undersigned took over this case, a previous Judge of this Court adopted (wholesale and without explanation) a previous (and now-retired) Magistrate Judge's report and recommendation on the Officers' Motion to Dismiss. *See* Order Affirming Magistrate Judge's Report at 2–3. In that order, it's true, the prior District Judge agreed with the (quondam) Magistrate Judge that the "Plaintiff's excessive force, *failure to intervene*, and retaliation claims [should] proceed against Sergeant Quest, in his individual capacity[.]" *Id*. at 2 (emphasis added). Nor was this imagined failure-to-intervene claim confined to Quest: the former Magistrate Judge's report—and the prior District Judge's order—invented, of whole cloth, failure-to-intervene claims against all five Officers. *Id*.

"[A] court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court." *Oliver v. Orange Cty.*, 456 F. App'x 815, 818 (11th Cir. 2012); *see also id.* ("Law of the case applies only where there has been a final judgment[.]" (citing *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991))). And, in *Vintilla*, the Eleventh Circuit held that "the district court's denial of the government's initial motion to dismiss was not a final judgment. The court was therefore free to reconsider its ruling on jurisdiction at the summary judgment stage." *Vintilla*, 931 F.3d at 1447; *see also Alsobrook v. Alvardo*, 656 F. App'x 489, 493 n.3 (11th Cir. 2016) ("But law of the case applies only where there has been a final

judgment, and a district court's denial of a motion to dismiss is not a final order. The court's order at the dismissal stage did not bind it at the summary judgment stage." (cleaned up)).

Because the Plaintiff never advanced a failure-to-intervene claim in his SAC—indeed, because the Plaintiff never asserted any facts, either in his SAC or in his testimony, from which this Court could reasonably infer that he had raised such a claim—this Court **REVERSES** its prior ruling, **SUSTAINS** the Defendants' Objection, and **VACATES** the Report on this question (*see* Report at 32).

### III.    Retaliation

Next, Sherman alleges that Quest retaliated against him for filing a grievance by moving him (for about two weeks) to a "cell which has a large steel plate covering virtually the entire window on the cell's door." SAC at 10; *see also* Pl. SOF at 9, ¶ 8 ("Plaintiff was moved into a cell from March 10, 2018 to March 24, 2018 that had no window[.]"). In his MSJ, Quest did not assert qualified immunity as a defense. *See* Officers' MSJ at 17–18.

The Report recommended that Sherman's claim be dismissed because he had "failed to show an adverse action as a result of Plaintiff's grievance." Report at 25. In his Objections, Sherman contends that Quest's decision to move him to a windowless cell constituted just such an adverse action.[14] *See* Pl. Obj. at 4–5. ("Plaintiff has in his possession a movement order that was

---

[14]     The Report properly rejected Sherman's other objection—that Quest threatened him into signing a false affidavit, *see* Pl. Obj. at 5—because the allegation was "not in the operative complaint." Report at 25 n.9. It is by now beyond peradventure that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

Sherman's final objection to the Report's resolution of his retaliation claim—that "Sergeant Quest has intercepted 3 out of 4 grievances to administration!!" Pl. Obj. at 5—is irrelevant to the only question at issue here: whether Quest's decision to transfer Sherman to a windowless cell constituted an adverse action. Sherman, after all, filed three of these grievances *after* the cell transfer—a sequence that belies any suggestion that the cell transfer was Quest's way of retaliating against him *because of* those grievances. Sherman also never argues that these

39

signed and authorized by Sgt. Quest to move Plaintiff to a cell with no window on March 10, 2018. This is the underline adverse effect end underline after Plaintiff filed a sick call and grievance on March 9, 2018.") (emphasis in original).

Sherman's retaliation claim has three elements: *First*, "that his speech or act was constitutionally protected; *second*, that the defendant's retaliatory conduct adversely affected the protected speech; and *third*, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett*, 423 F.3d at 1250 (emphasis added).

Neither side disagrees with the Report's conclusion that Sherman's grievance constituted constitutionally protected speech. Nor could they. "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011). While Sherman's initial grievance is not in the record, the Defendants agree that it "grieved the 'beating in question,' and detailed his 'need for emergency medical treatment.'" Report at 24–25 (quoting SAC at 10). That grievance, in short, is protected by the Constitution.

But Sherman trips on the next element: proving an adverse effect. An "adverse" effect is one that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1254. The Report rejected Sherman's contention that the cell transfer constituted an adverse effect for two reasons: *first*, because the cell transfer had no effect on Sherman's ability to receive medical care; and *second*, because being transferred for two weeks to

---

interceptions, in and of themselves, constituted adverse actions. Nor could he. Sherman did not assert this allegation in his SAC, and (again) it's well established that a party cannot amend his complaint in a response to a motion for summary judgment. *See Gilmour*, 382 F.3d at 1315.

a windowless cell would not deter a person of ordinary firmness from filing legitimate grievances. *See* Report at 26. Sherman objects to both findings. *See* Pl. Obj. at 4.

With respect to the first, Sherman says that he received "no medical treatment till March 15, 2018," *see id.* at 6. But this objection is belied by (1) Sherman's own Statement of Facts and (2) parts of the record Sherman doesn't challenge. Sherman, after all, was transferred to his new cell on March 10, 2018. The very next day—March 11, 2018—Sherman's request for x-rays was approved.[15] *See* Sick Call Request at 203–05. Sherman also admits that he received treatment from "a male sick call nurse" on the evening of March 14, 2018, and from A.R.N.P Migrano the following day. *See* Pl. SOF at 5, ¶ 12. And it's undisputed that Sherman had x-rays taken on March 16, 2018, *see* Radiological Consultation at 206–08—all while he was still in the windowless cell. All told, then, Sherman received treatment from medical professionals on three of the first six days immediately following his transfer—thus undermining his claim that the transfer precluded him from receiving medical attention. Sherman's objection to this aspect of the Report is therefore **OVERRULED**.

Sherman's second objection—that the transfer itself would "deter a person of ordinary firmness," *Bennet*, 423 F.3d at 1254—fares no better. To begin with, "the Constitution does not mandate comfortable prisons[.]" *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Thus, "[a]lthough it is possible that in some cases placement in administrative segregation would not deter a prisoner of ordinary firmness from exercising his or her First Amendment rights, we cannot say that such

---

[15] As noted in n.3 *supra*, it seems possible that Sherman was seen on March 11—because two separate documents suggested that someone checked his vitals that day. *See* Sick Call Request at 203–05; *see also* Progress Notes. But, because Sherman denies having been seen on March 11, we must accept his version of the facts—sworn under oath at his deposition—as true. *See* Sherman Dep. at 147 ("[T]his is a manipulated document [referring to the Sick Call Request] that was manipulated a month or two after the incident.").

action can never amount to adverse action. On the contrary, whether a prisoner-plaintiff has met that prong of his or her retaliation claim will depend on the facts of the particular case." *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000). Unsurprisingly, then, "[t]he definition of adverse action is not static across contexts. Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999).

Typically, a transfer from one cell to a fairly-equivalent new cell will not constitute an adverse action unless the transfer is accompanied by something more—for instance, a loss of privileges or the presence of some unsanitary condition. *Compare Lawson v. Crowther*, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018) ("While transferring between equivalent cells within a short period of time may have been an annoyance, the Court cannot conclude that it would deter a person of ordinary firmness from exercising his constitutional rights."); *Presley v. Scott*, 2014 WL 7146837, at *4 (N.D. Ala. Dec. 15, 2014) (A "decision to move the plaintiff from one general-population cell to another worked no materially adverse effect on the plaintiff"); *Verbanik v. Harlow*, 2012 WL 4378198, at *3 (W.D. Pa. Sept. 25, 2012) ("He has not shown through evidence how the new location was any less desirable than his old location, for example, that he was subjected to increased security or loss of privileges.") *with Burton v. Rozum*, 422 F. App'x 140, 142 (3d Cir. 2011) ("[A]lthough a transfer to a different cell block may not be an adverse action 'sufficient to deter' an ordinary person from filing a grievance, the Magistrate Judge failed to acknowledge that the transfer resulted in the loss of Burton's prison job, which may constitute a sufficiently serious adverse action."); *Clark v. Daddysman*, 2018 WL 145333, at *12 (D. Md. Mar. 22, 2018) ("Clark's assertion that he was moved to a cell with human feces for two weeks satisfies this [adverse action] requirement."); *Desposito v. New Jersey*, 2015 WL 2131073, at *16 (D. N.J.

May 5, 2015) ("The toilet backed up and, despite the unbearable smell, the sheriffs refused to permit Plaintiff or his cellmate to change cells or use the bathroom elsewhere. For purposes of screening, the Court construes Plaintiff to allege claims for retaliation under § 1983 and finds that these claims survive screening." (internal citations omitted)); *Chruby v. Bearjar*, 2018 WL 457404, at *12 (M.D. Pa. Aug. 27, 2018) ("[T]he transfer implicated the availability of housing accommodations and medical treatment that could detrimentally affect his health. Moreover, a change in a prisoner's status from single-cell to double-cell may also constitute an adverse action.").

On facts that were (strikingly) similar to ours, the District of Rhode Island rejected the plaintiff's claim that a cell transfer constituted an adverse action. *See Moore v. Weeden*, 2012 WL 733837, at *6 (D. R.I. Mar. 6, 2012). In that case, the district court found that the plaintiff had "failed to submit any competent evidence that [the defendant's] action in moving him to a cell in a less desirable location constitutes an adverse action." *Id*. The court added: "the fact that the new cell abutted a concrete wall and provided less access to human contact does not rise to the level of punishment." *Id*. And, because the plaintiff had spent only fourteen days in disciplinary confinement, the court concluded that "the duration of the time he spent in this less desirable cell was not so long as to constitute a rights violation, and Mr. Moore does not articulate any facts detailing the harm he suffered as a result of this fourteen-day relocation." *Id.*

Sherman does not deny that, aside from a concrete barrier that (mostly) occluded the view, his new cell was equivalent to the old one. Pl. SOF at 6, ¶ 17. It wasn't, for example, materially smaller, colder, or hotter than his old cell. It didn't (as in *Burton*) result in the loss of any privileges or (as in *Chruby*) foist onto Sherman additional cellmates. Nor did it come with a backed-up toilet, feces-covered walls, or any of the other unsanitary conditions that courts have found sufficient to

sustain a retaliation claim. *See, e.g.*, *Clark*, 2018 WL 145333, at *12; *Desposito*, 2015 WL 2131073, at *16. Most importantly, as in *Moore*, Sherman was transferred to the new cell for disciplinary reasons—the Disciplinary Committee, after all, had adjudicated him guilty—and for only sixteen days. *See* Disciplinary Committee Action Sheet.

Indeed, the transfer didn't even stop Sherman from filing additional grievances. *See* Pl. SOF at 5, ¶¶ 13–15 (noting that Sherman submitted three additional grievances); Response to Henri MSJ at 23, 30, 51 (Sherman's second, third, and fourth grievances—dated April 2, 7, and 10, 2018, respectively). And, while "[a] plaintiff's 'actual response to the retaliatory conduct' is not dispositive of the question of whether such action would likely deter a person of ordinary firmness," *Martin v. Duffy*, 858 F.3d 239, 250 (4th Cir. 2017) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004), Sherman's submission of additional grievances certainly "illustrates that a person of ordinary firmness would likely not be deterred from engaging in such speech," *Mitchell v. Thompson*, 564 F. App'x 452, 457 (11th Cir. 2014). In other words, even accepting all of Sherman's factual averments, he has failed to show that his transfer to a fairly-identical (but windowless) cell "adversely affected the protected speech[.]" *Bennett*, 423 F.3d at 1250.

But, even if it had, Sherman has failed to adduce any evidence of "a causal connection between the retaliatory actions and the adverse effect on speech." *Id*. In this third prong of the retaliation test, a plaintiff must first show that "the protected conduct was a motivating factor behind the harm." *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008). If he can do so, "the burden of production shifts to the defendant," *id*., who must (at this final step) "show it would have taken the same action in the absence of the protected activity," *Smith v. Fla. Dep't of Corr*., 713 F.3d 1059, 1063 (11th Cir. 2013).

44

To establish a "causal connection," the Plaintiff must do more than simply allege a connection in conclusory fashion. *See, e.g.*, *Williams v. Brown*, 347 F. App'x 429, 435 (11th Cir. 2009) ("Although Williams's complaint alleges that a constitutional violation occurred, the complaint fails to allege facts that associate Johnson or Tompkins with that violation. Williams simply asserts that 'Brown, Johnson, and Tompkins subjected [him] to a retaliatory negative transfer twice as far from [his] family . . . .' This assertion does not raise his right to relief against Johnson and Tompkins above the speculative level."). To satisfy his burden, then, a plaintiff must point to evidence of retaliatory motive in the record. *See Smith,* 713 F.3d at 1063 ("Smith attached inmate affidavits to his complaint and his response to the FDOC's motion for summary judgment. These affidavits established, among other things, that Smith and other inmates were transferred immediately after filing lawsuits and/or grievances, and inmates who filed lawsuits and grievances were transferred more often than the average inmate. When viewing the evidence, including the affidavits, in the light most favorable to Smith, he sufficiently established that one could conclude that the protected conduct was a motivating factor behind the transfers.").

But Sherman has submitted *no evidence*—neither affidavits, nor testimony, nor any other documentation—to support his claim of retaliatory motive. Instead, Sherman says only that: "I was in this cell from March 10, 2018 to March 26, 2018. This was in retaliation from Sgt. Quest for writing grievances and a sick call for my injuries." Pl. SOF at 6, ¶ 17. In this respect, Sherman's (wholly) conclusory allegations bear a striking resemblance to the "speculative" assertions the Eleventh Circuit found insufficient in *Williams*. *See Williams*, 347 F. App'x at 435. In that case, the Eleventh Circuit found the plaintiff's "assert[ion] that [the Defendants] subjected him to a retaliatory negative transfer" simply too speculative to satisfy even the *Twombly* plausibility standard. *Id.* The Court therefore affirmed the district court's dismissal of the plaintiff's complaint.

45

*Id.* Our case, of course, is now at summary judgment, where Sherman must adduce enough evidence to create a genuine issue of material fact on the question of retaliation. *See Celotex*, 477 U.S. at 323 (holding that a district court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case."). Despite this added burden, Sherman has done nothing more than the *Williams* Plaintiff did: allege, in a conclusory way, that, in transferring him to a windowless cell, Quest was retaliating against him for filing a grievance. If this bare-bones allegation was insufficient in *Williams*, it isn't anywhere near enough here.

What's worse, while Sherman claims to have "a movement order that was signed and authorized by Sgt. Quest," *see* Pl. Obj at 4, he never filed this order on the docket, *see generally* Response to Officers' MSJ. As a result, the record contains no evidence either (1) that Quest was ever even involved in the transfer or (2) that the unnamed employee who did transfer him was (in any respect) tainted by Quest's (alleged) animus. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by [] citing to particular parts of materials *in the record . . . .*") (emphasis added). Sherman, in sum, has failed to produce any evidence from which a reasonable juror could conclude that "the protected conduct was a motivating factor behind the harm." *Mosley*, 532 F.3d at 1278. Sherman's Objections to the Report's recommendation on this question are, therefore, **OVERRULED**; and the Defendants' MSJ as to Count 3 is **GRANTED**.

## IV.    Deliberate Indifference

Sherman alleges that Henri, a nurse at the Main Jail, was deliberately indifferent to his serious medical needs. SAC at 9–10. The Report recommended granting Henri's MSJ because it found that, even viewing the facts in the light most favorable to Sherman, no reasonable juror

could conclude that Henri acted with deliberate indifference.[16] *See* Report at 29. Sherman timely objected. Pl. Obj. at 1.

A plaintiff asserting a claim of deliberate indifference must prove "both an objective and a subjective component." *Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257, 1266 (11th Cir. 2020). *First*, a plaintiff must establish "an objectively serious medical need—that is, 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention'—that, if left unattended, poses a substantial risk of serious harm." *Id.* (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). *Second*, the plaintiff must demonstrate that the defendant "acted with deliberate indifference to that need by showing (1) that they had subjective knowledge of a risk of serious harm and (2) that they disregarded that risk (3) by conduct that was more than mere negligence." *Id.* (internal citations omitted).[17]

Deliberate indifference "describes a state of mind more blameworthy than negligence" but less blameworthy than "acts or omissions for the very purpose of causing harm or with knowledge

---

[16]  Henri did not assert qualified immunity as a defense. *See generally* Henri MSJ.

[17] Because Sherman was a pretrial detainee, *see* First Report at 1, his deliberate-indifference claim sounds, not in the Eighth Amendment's protection against "cruel and unusual punishments," but in the Fourteenth Amendment's guarantee of due process, *see Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) ("[T]he plaintiffs' claim technically arises under the Fourteenth Amendment because they are pretrial detainees rather than convicted prisoners[.]"). Either way, though, the claim is "evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment." *Id.* (citing *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 (11th Cir. 2017)); *see also Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) ("However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees."). The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Thus, while Sherman's excessive-force and deliberate-indifference claims both emanate from the Fourteenth Amendment, the two claims require this Court to draw from distinct bodies of constitutional jurisprudence: the former looks to Fourth Amendment law, whereas the latter is guided by the (somewhat-more-circumscribed) corpus of Eighth Amendment cases.

that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Deliberate indifference is "the equivalent of recklessly disregarding that risk." *Id*. at 836. To show recklessness, the official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id*. at 837. Even "an official's failure to alleviate a significant risk that he *should* have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*.

"[A] prisoner bringing a deliberate-indifference claim has a steep hill to climb. We have held, for instance, that the Constitution doesn't require that the medical care provided to prisoners be 'perfect, the best obtainable, or even very good.'" *Keohane*, 952 F.3d at 1257 (quoting *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991)). To the contrary, "medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id*. (cleaned up). In fact, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment fails to support a claim of cruel and unusual punishment." *Id.* Deliberate indifference can include "a showing of grossly inadequate care as well as [] a decision to take an easier but less efficacious course of treatment." *Brown*, 387 F.3d at 1351. And, when "the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Id*. "An official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe Cty.*, 116 F.3d 1419, 1425 (11th Cir. 1997).

48

The Court here assumes that two fractured ribs constitute an objectively serious medical condition. *Cf. Minnis v. GEO Corp.*, 2019 WL 5926898, at *8 (S.D. Fla. Oct. 9, 2019) ("A reasonable juror could conclude that Plaintiff's injuries are an objectively serious medical need. It is undisputed that Plaintiff had nondisplaced anterior left sixth and seventh right rib fractures."); *Keele v. Glynn Cty.*, 938 F. Supp. 2d 1270, 1293 (S.D. Ga. 2013) ("Thompson entered the GCDC with bruised or fractured ribs. While at the GCDC, Thompson developed a rash. These conditions were diagnosed and treated by medical personnel. Consequently, these conditions were objectively serious medical needs."). Sherman has thus satisfied his burden on the first (objective) element of his deliberate-indifference claim. But his claim fails because he's produced precious little evidence in support of the two remaining (subjective) components of his claim. In particular, he's adduced virtually no evidence that either (1) Henri *subjectively* knew of his broken ribs or (2) Henri's treatment fell below the constitutional minimum. We address each in turn.

Let's start with subjective knowledge. To survive summary judgment, Sherman must provide *some* evidence that Henri had "subjective knowledge of a risk of serious harm." *Keohane*, 952 F.3d at 1266. When Henri first encountered him, Sherman was bleeding from a wound on his face and complaining about pain in his ribs. *See* Sherman Dep. at 150:4–5; Henri's Statement of Facts ("Henri's SOF") [ECF No. 114-1] at ¶ 7. Sherman told Henri that "I can't see straight and my face and jaw was [sic] in a lot of pain and my ribs are broken and they hurt very badly from any type of movement. I felt my ribs move inward as they don't usually move and my face would not stop bleeding." Pl. SOF at 4, ¶ 10.

In response, Henri wiped the blood off with saline solution, "put some neosporin on it," checked Sherman's vitals (which were normal), and assessed his cognitive state (also normal). Sherman Dep. at 118; Henri Aff. ¶ 6. Henri "completed wound care and determined that the cut

did not need stitches." Henri Aff. ¶ 7. Henri followed up with Sherman an hour later, giving him

pain medicine and advising him to seek follow-up care if the pain did not subside. *See* Sherman

Dep. at 127 ("Q: Did – after Nurse Henry [sic] cleaned your wound, did he eventually come back

up to give you Motrin? A: I think he did come up there, and he gave me some Motrin and an ice

pack. Q: During medical rounds? A: Yes, I would think about an hour later, yeah. Yes. He did give

me an icepack and that was, that was it. After, you know – you know, I think he gave me some

bandages, too, but I needed bandages – and that was it.").

While none of this seems unreasonable, Sherman castigates Henri for failing to diagnose

his broken ribs. *See* SAC at 9–10; Response to Henri's MSJ at 10, ¶ 19. But Sherman admits that

"Nurse Henri is not certified, nor does he have the instruments or technology to determine the

extent of broken ribs and jaw/brain swelling." Pl. Obj. ¶ 6. Sherman Henri, for his part, testified

that, "[b]ased on my evaluation of Mr. Sherman, I determined that Mr. Sherman did not need x-

rays nor emergency observation by a doctor." Henri Aff. ¶ 8.

And this all makes sense. Ribs, after all, are *internal*. This Court won't create a rule that

defaults as a constitutional violation anytime an unspecialized triage nurse fails to divine, from a

patient's side pain, the presence of fractured ribs. *Cf. Brown v. Borough of Chambersburg*, 903

F.2d 274, 278 (3d Cir. 1990) ("Plaintiff testified that when he went to see the prison physician

complaining of pain in his ribs, the doctor conducted only a visual examination of his upper chest

and did not press on his ribs, thereby failing to discover the full extent of his injuries. . . . Upon

release from custody, plaintiff obtained medical treatment at a local hospital where two ribs were

found to be broken. . . . [W]e [can]not characterize the doctor's conclusion based on a visual

examination that plaintiff had only a bruise as a failure to exercise medical judgment. The most

that can be said of plaintiff's claim is that it asserts the doctor's exercise of deficient professional

judgment."); *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 525 (9th Cir. 1999) ("Dr. Sakamoto's failure to diagnose Ruvalcaba's broken ribs caused a thirty-six hour delay before Ruvalcaba was treated, resulting in Ruvalcaba suffering a significant amount of pain. Although such errors may support a finding that Dr. Sakamoto was negligent, the facts do not support an inference that Dr. Sakamoto acted purposely with deliberate indifference."); *Brown v. Perez*, 2015 WL 2153451, at *4 (C.D. Cal. May 7, 2015) (same); *Bennett v. Minei*, 2016 WL 6905935, at *2 (N.D. Tex. Aug. 26, 2016) ("Although Plaintiff claims that Parkland Hospital Defendants failed to diagnose and treat his broken ribs, Plaintiff's allegations establish, at most, a claim of negligence. Negligence, or even gross negligence, does not rise to the level of a constitutional violation."). On these (very limited) facts, then, no reasonable juror could conclude that Henri had subjective knowledge of Sherman's "serious medical needs."

Nor can Sherman satisfy the other prong ("conduct that is more than mere negligence") of his deliberate-indifference claim. Medical care violates constitutional guarantees only "when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Keohane*, 952 F.3d at 1266. On March 8, 2018, Sherman presented with a small cut, which Henri appropriately treated with some combination of saline solution, Neosporin, and bandages. Henri Aff. ¶ 7. For Sherman's side pain, Henri prescribed Motrin and recommended that Sherman seek follow-up care if the pain did not subside. *Id.* ¶¶ 9–10. None of this "shock[s] the conscience." *Keohane*, 952 F.3d at 1257.

The Eleventh Circuit recently affirmed a district court's entry of summary judgment on (very) similar facts. *See Phillips v. Robbins*, 752 F. App'x 759, 764 (11th Cir. 2018). In *Phillips*, the plaintiff presented to the defendant-nurse with "sudden, severe back pain." *Id.* As here, though, the plaintiff's injury "was not visibly obvious," and nothing suggested "anything other than

sudden, severe back pain." *Id.* The nurse diagnosed him with "an inflamed muscle" and "recommended a course of treatment in accordance with her diagnosis." *Id.* This diagnosis was, of course, ultimately wrong; in reality, Phillips had a bulging disc in his back. *Id.* Nevertheless, the Eleventh Circuit determined that the nurse's course of treatment was reasonable because "[Phillips'] strained posture and walk also did not obviously demonstrate to Nurse McIntosh that her diagnosis was wrong or that a risk of serious harm was present." *Id.* Notably, the Eleventh Circuit rejected the plaintiff's argument—which Sherman advances here[18]—that, at the very least, the nurse should have referred him to a specialist. *Id.* In doing so, the court reasoned that the nurse's "rejection of his requests for a doctor referral, a more qualified evaluation, x-rays, and pain medication were consistent with that decision and her diagnosis and did not demonstrate deliberate indifference." *Id.* (quotation marks omitted). The court thus concluded that "[a]n inadvertent or negligent failure to provide adequate medical care, even if it amounts to medical malpractice, does not constitute deliberate indifference. . . . Nor does a simple difference in medical opinion." *Id.* (citing *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). It's worth noting, too, that the care the nurse in *Phillips* provided was (if we're being candid) much worse than Henri's. So, for instance, the *Phillips* nurse neither checked the plaintiff's vital signs nor wrote a report. *Id.* Henri can hardly be faulted for doing more.

Sherman levies two objections—both unpersuasive. *First*, he alleges that Henri "knowingly wrote a[n] inaccurate medical report." Pl. Obj. ¶ 1. Here, Sherman doesn't dispute that Henri properly documented his head injuries. Rather, he says only that Henri failed to diagnose his fractured ribs. Again, however, Sherman admits that Henri had neither the training nor the technology to diagnose broken ribs. Pl. Obj. ¶ 6. In any case, while the "failure to diagnose can be

---

[18] More on this below.

deemed extremely negligent, it does not cross the line to deliberate indifference." *McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999).

*Second*, Sherman contends that, at the very least, Henri should have referred him to a specialist. For his part, Henri attested that he didn't believe a referral was medically necessary. *See* Henri Aff. ¶ 8. Either way, the Eleventh Circuit has held that a provider's refusal to refer a patient to a specialist is "not deliberate indifference, but a disagreement over a course of treatment, and, therefore, summary judgment was properly granted to both defendants[.]" *Hilton v. McHugh*, 178 F. App'x 866, 871 (11th Cir. 2006); *see also Phillips*, 752 F. App'x at 764 (rejecting plaintiff's claim that nurse's refusal to refer him to a medical specialist constituted deliberate indifference); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) ("Additionally, Dr. Hill's denial of Amarir's request to see an outside specialist at the prison's expense did not amount to deliberate indifference. A prison inmate has no independent constitutional right to outside medical care supplemental or additional to the medical care provided by the prison staff within the institution.").

The Eleventh Circuit has (notably) rejected deliberate-indifference claims in far more egregious circumstances. *See, e.g.*, *Hilton*, 178 F. App'x at 871. In that case, the plaintiff suffered from genital cysts and elbow bursitis. *See id*. at 868. In May 2002, the defendant-nurse treated the cysts and determined, "in his medical opinion," that referral to a specialist was unnecessary. *Id.* Instead, he prescribed ibuprofen. *Id.* The plaintiff didn't complain of elbow pain again until October 2002, when a *different* nurse prescribed ibuprofen and an analgesic rub. *Id.* at 868–69. In November and December, the plaintiff filed two grievances about (what he deemed) substandard care. *Id.* The jail denied both grievances: the first because more treatment was unnecessary; the second because he hadn't followed up after his October treatment and because he still had some "sick call" available. *Id.* In 2003, the defendant-nurse treated the plaintiff three times (in April,

July, and August). *Id*. In September, a third nurse saw him. *Id.* Ultimately, however, the plaintiff

required (and underwent) corrective surgery to remove a golf-ball sized cyst from his elbow. *Id.*

He sued, alleging that the defendant-nurse's refusal to refer him to a specialist caused him two

years of unnecessary pain. *Id.* The trial court granted the defendant's motion for summary

judgment, and the Eleventh Circuit affirmed, noting that:

> McHugh's affidavit states that, in his medical opinion, he did not think Hilton's
> elbow required the treatment of a specialist, and indeed, the medical records
> indicate that McHugh repeatedly prescribed medication for the swelling in Hilton's
> elbow as well as his knee, and Hilton himself admits that he was
> prescribed Naprosyn, ibuprofen, and Vioxx, as well as two elbow braces. Hilton's
> core complaint is that he should have been referred to a specialist, which McHugh
> believed was not medically necessary. As noted above, that is not deliberate
> indifference, but a disagreement over a course of treatment, and, therefore,
> summary judgment was properly granted to both defendants with regard to Hilton's
> elbow claim.

*Id*.

In our case, Henri "determined that Mr. Sherman did not need x-rays nor emergency

observation by a doctor." Henri Aff. ¶ 8. And, like Hilton, Sherman has pointed to no medical

evidence—or, for that matter, *any* evidence (aside from his own preference)—for his position that

a referral was medically necessary. This absence of evidence is fatal to his claim. *See Harris v.

Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Nor does a simple difference in medical opinion

between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment

support a claim of cruel and unusual punishment."); *Edwards v. Schrubbe*, 547 F. App'x 787, 790

(7th Cir. 2013) ("Dissatisfaction with a course of treatment does not give rise to a claim of

deliberate indifference; rather, deliberate indifference can be inferred only if a treatment decision

was not based on an exercise of medical judgment.").

Nor could Sherman have shown that a referral was necessary, even had he tried. Sherman,

after all, wasn't hemorrhaging blood, suffering from appendicitis, or wasting away with some other

time-sensitive condition. Sherman had two broken ribs—for which (aside from rest) there *is no* treatment. Indeed, even after an x-ray diagnosed the broken ribs a couple days later, Sherman received *no* special (or different) treatment—other than a rib binder and some pain medication.[19] *See* Response to Henri MSJ at 14. That the specialist ultimately prescribed no special treatment strongly undermines Sherman's claim that Henri's decision not to refer him was constitutionally negligent. *See Bailey v. Gardebring*, 940 F.2d 1150, 1155 (8th Cir. 1991) ("That the prison administrators' failure to provide medical care must rise to the level of deliberate indifference presupposes the availability of a cure or at least some accepted form of treatment for the prisoner's medical needs: if there is nothing that can be done, or no accepted way of treating the condition, deliberate indifference is indistinguishable from steadfast vigilance. A condition for which there is no known or generally recognized method of treatment cannot serve as a predicate for the conclusion that failure to provide treatment constitutes deliberate indifference to the serious medical needs of prisoners." (cleaned up)); *Edwards*, 547 F. App'x at 789–90 ("[T]he Eighth Amendment does not give [the Plaintiff] the authority to dictate specific treatment, and that is especially so in a case like this where the undisputed evidence establishes that, at least for Edwards, any available treatment would be cosmetic.").

No reasonable juror, in sum, could conclude either that Henri subjectively knew about Sherman's broken ribs or that the care Henri provided was constitutionally infirm. Sherman's Objections on this issue are, therefore, **OVERRULED**; and Henri's MSJ is **GRANTED** as to Count 12.

---

[19] To alleviate the Plaintiff's workload, he was apparently also moved to a bottom bunk. *See* Response to Henri MSJ at 14.

***

Having carefully reviewed the parties' briefs, the record, and the governing law, the

Court hereby

**ORDERS AND ADJUDGES** as follows:

1.  The Report and Recommendation [ECF No. 149] is **ADOPTED in part and VACATED in part**.

2.  Ronald Henri's Motion for Summary Judgment [ECF No. 114] is **GRANTED in full**.

3.  The Officers' Motion for Summary Judgment [ECF No. 117] is **GRANTED in part** as to the Retaliation Claim (Count 3) and **DENIED in part (and without prejudice)** as to the Excessive Force claims (Counts 1, 4, 6, 8, and 10).[20]

4.  Within **21 days of this Order**, the Officers may file a Renewed Motion for Summary Judgment—limited *only* to the question of qualified immunity. That Renewed Motion may *not* exceed **ten pages**. Within 21 days of receiving the Renewed Motion, the Plaintiff may file a Renewed Response, in which he may contend that the Officers are *not* entitled to qualified immunity. If the Plaintiff files such a Response, the Plaintiff should explain whether he is relying either on (1) "clearly established" law from the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, or the Supreme Court of Florida that would have put the Officers on notice that their conduct was unconstitutional, or (2) the "apparent" unconstitutionality of the Officers' conduct, *see, e.g.*, *Lanier*, 520 U.S. at 271;

---

[20] Because the failure-to-intervene claims (Counts 2, 5, 7, 9, and 11) were never in the SAC to begin with, the Court sees no need to dispose of them by formal order.

*Mattox*, 127 F.3d at 1419 (11th Cir. 1997). The Plaintiff's Renewed Response may *not* exceed **ten pages**. Within **14 days** of receiving the Plaintiff's Renewed Response, the Officers may file a Renewed Response (again, limited only to the issue of qualified immunity), which may *not* exceed **five pages**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of November 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     Counsel of record
        Steven Douglas Sherman, *pro se*

57